The McCarran-Ferguson Act provides that coercive practices are subject to antitrust scrutiny even if they involve the quote business of insurance as the Supreme Court has narrowly defined that term. The amended complaint alleges in paragraphs 52 through 67 that Florida Blue acted coercively in selectively enforcing broker exclusivity to impede Oscars entry into the Orlando ACA market. The district court erred in holding otherwise and dismissal of Oscars complaint must be reversed on that ground alone. It also must be reversed independently because even before reaching the issue of coercion, the district court erred by holding that Florida Blue's enforcement of broker exclusivity constituted the business of insurance. The Supreme Court has repeatedly admonished that that exemption is quote narrow and meant to cover the underwriting and transfer of policyholder risk. Florida Blue's enforcement of exclusivity as a term of its separate arrangement with brokers bears no resemblance to those practices, and it satisfies no part of the Supreme Court's controlling test in Perrano. It doesn't effectuate the transfer of policyholder risk under the policies. It's not remotely a quote integral part of the policy relationship between Florida Blue and its policyholders, and broker exclusivity arrangements are ubiquitous, not unique to insurance. And the conduct alleged is coercion in the classic sense. The complaint alleges that Florida Blue leveraged its monopoly power to coerce brokers to cut ties with Oscar, threatening to terminate those who'd signed up with Oscar, to withhold commissions already earned, and to permanently disbar disobedient – to permanently bar disobedient brokers from selling Florida Blue insurance of any type anywhere. That is prototypical coercion under Hartford Fire. Florida Blue doesn't defend the district court's rationale for deeming these practices non-coercive. It argues instead that coercion under the Sherman Act requires both collective action and the leveraging of unrelated transactions. That is wrong, but at any event, the complaint alleges both, and the amended complaint should therefore be reinstated. I think it's wise that you're leading with coercion. Let me ask you a question about that. Are you essentially arguing for a monopolist exception in the sense that the way you're reading coercion – is there any difference between the way you're reading coercion and if we had just said monopolist as the exception instead of coercion? Thank you, Judge Brasher. It's an interesting question. Let me say two things. Number one, under the Sherman Act, not everything the monopolist does is necessarily coercive. There are monopolistic practices that the Sherman Act precludes that may not constitute coercion, as that term has been – and again, the Supreme Court has said should be construed both in a broad and unqualified sense. Coercion, we understand from the court's Sherman Act cases, is the use of a party that has market power to use that economic power to compel another to accede to terms that the other party wouldn't accept. And so while we have to plead – and again, we're only at the motion-to-dismiss stage. There is yet to be resolved summary judgment and trial. The question is, have we adequately pleaded coercion under Section 3B of McCarran-Ferguson within the broad and unqualified sense that that term is used? And I would argue that this – what's alleged here is the archetype of coercion. I guess I'll – before I move to the business of insurance, which in some ways – Can I follow up on that, Mr. Waxman? Yes, Judge Luck. I'm sorry. No, you're fine. So I appreciate that you can see that it's not just enough to be a monopolist, that there has to be something more to it. But it seems that there has to be some daylight between activities that would be legal under the Sherman Act and that which is deemed coercive, boycott, etc. under the Magnuson-Ferguson Act. Would you agree with that premise first? Yes. I think the canon of – there are two canons of construction that are relevant here. One is the canon against reinterpreting a statute to include surplusage, and the other is nascitor associus, which is evaluating the terms. So our understanding is that coercion, intimidation, and boycott are three separate terms. They have interrelated – some overlapping meanings, but coercion has to be interpreted on its own. Something that – something can be coercive even if it doesn't constitute a boycott because, as we know from the Supreme Court, boycott under the Sherman Act requires collective action. If it's just compelling, though, as I think – I think I heard you reiterate the definition that you argued in your brief, or compelling someone to do something. How do we square that with Hartford Fire, which I know is a boycott case, but the court there seemed to say that exacting terms like those which a monopolist might exact from someone else is not coercing anyone, at least in the usual sense of that word. So in other words, it can't just be exacting terms from someone using their monopolist's power. It has to be – it seems to me something greater or more than that, but less than what – but less than what's required or different than what's required by the Sherman Act. Okay, so if I understand your question, I mean a major difference between coercion and boycott is that only the latter requires concerted action. The former does not. You can obviously coerce or intimidate somebody otherwise, but I understand Your Honor's question to go to, but what is it that's more than just exerting your economic power? I'm a monopolist, and I say to you, hey, if you want to buy my – if you retail store want to sell my product, you have to charge this price. Otherwise, I won't sell it to you. That is not coercion in the classic sense that the Sherman Act uses the term. I think – and again, my friend Mr. Chesler has made a great deal in his brief about the fact that coercion necessarily requires the leveraging of an unrelated transaction. And I think whether that is or isn't true depends on how broadly you read unrelated transaction, but as the – it is very much alleged in this case in two respects. Number one, as the Supreme Court in Royal Drug made clear at both 803 and page 808 of its opinion, the classic sense of a leveraging an unrelated transaction is X who has market power refuses to deal with Y unless Y refuses to deal with Z. That's exactly what's alleged here. And moreover, what's alleged here is – Why is it not though – why is this not similar to the example you gave, counsel, where Blue Cross is saying before any Oscar came into the scene, if you want to sell my insurance, you have to be exclusive for me. You can't do something else in the same way that if Tommy Bahamas wants someone to sell its product, it can't sell the competitor's product in the same store. How is that unreasonable for a retailer to do in the same way that it would be unreasonable for anyone else who has a salesman sell on their behalf? So I think two points, Judge Luck. One is that what is alleged in the complaint is more than merely the enforcement – the writing and enforcement across the board of an exclusive broker arrangement, although I do want to point out that when that is done by a party with monopoly power, it certainly can constitute coercion. And you just have to look at the Supreme Court's tying cases. It's not coercive if a mom-and-pop store says you can't buy bread from me unless you also buy raisins from me. But if we were talking about a monopolist store making that demand, that would be coercion. But in any event, what the complaint alleges here is not just that. This complaint is alleging that a monopolist's selective use of its exclusive agency arrangement and threats of statewide termination in all product markets in order to prevent the entry of one and only one competitor. And a practice that is – we may or may not be able to satisfy our proof at trial in this case, but if that is correct, if, as we allege, Florida Blue No. 1 is the only major carrier in the country that enforces these exclusive dealing arrangements… … if it is doing so only selectively, these brokers that have signed these agreements have been permitted to sell insurance of other insurance companies except for insurance by Oscar. Counsel, isn't the practice, though, the exclusive agreements? In other words, the evidence of coercion is the threats that you've discussed. But the practice we're talking about, in other words, the focus, is the exclusive agreements, right? Do you agree with that? So I agree that in determining whether or not the business of insurance is involved, the practice is the use and enforcement of exclusive agreements, and the selective enforcement is just an a for sure case. With respect to coercion, it is very much a part of our case that this provision is being selectively enforced in order to harm one particular competitor and in order to preserve a monopoly position. If I may, I see that my – I'm sorry. Well, just quickly, I'm interested in that argument, the selective use of these exclusivity arrangements. And it seemed to me in your complaint you made a number – you alleged a number of examples of that. And then in your brief, did you say that those people mostly were people who were grandfathered in? I know we haven't developed the facts on this, but I just wondered if that had developed somehow that I didn't realize. So I think – and again, I'm simply reading the – I'm no better at reading the complaint than Your Honor is and probably nowhere near as good. But the complaint alleges that although this exclusivity provision had been a feature of Florida Blue's contracts with its brokers, it had not been enforced in the past. And even when it began to be enforced with a vengeance against – with respect to Oscar, brokers were allowed – with respect to other lines of insurance that they were selling, they were all grandfathered in. In other words, the new regime was we still have this clause, but we're only enforcing it with respect to writing insurance or selling insurance of Oscar. If I may just – I know that my time is almost up, but if I may just say just a word or two about the business of insurance. The exclusivity requirement in an insurer-broker agreement – and Judge Luck, I'm talking about across the board, not selectively – is not the business of insurance because – and I'm now ticking through the three perennial factors. It does not involve the underwriting or the transfer of a policyholder's risk. It is not integral or even related to the policy relationship between the insured and Florida Blue. And the practice of using exclusive agents or exclusive brokers is not limited to entities in this industry. It's ubiquitous across any number of industries. And for that reason, the narrow exception for the business of insurance, which the Supreme Court has said was designed to exempt from the federal antitrust laws, quote, cooperative rulemaking and the underwriting and transfer of risk is not satisfied here. Florida Blue – Can I ask a question about this? Please. What do you say about Thompson? I mean, it looks like – if this circuit has said that an exclusivity agreement that applies to all lines, not only insurance, you can't do anything but sell insurance, Howard Insurance, how can we then come back and say what you're suggesting, which is a narrower contract term is somehow not part of the business of insurance? So I guess, Judge Brasher, I have three things to say about Thompson. One is that Thompson, of course, was decided before the Supreme Court articulated the three-factor test in Perrano and reaffirmed in Hartford Fire that it indeed was a three-factor test announced in Perrano. And the application of that test to the facts in Thompson could not fail to have produced the opposite result. So number one, we think Thompson has been superseded as governing law in this circuit. Number two, Thompson itself reiterated that – I mean, it noted the observation of two district courts that the terms of an agreement between a broker and an insurance company are the business of insurance and then went on to refute it by saying plainly there are terms between an insurer and a broker that would not constitute the business of insurance. And, of course, as Your Honor's question suggested, the practice that would – the suit in that case was over the enforcement of a requirement that you not engage in businesses outside of insurance, which is not this case. But if we're bound by Thompson, though, I mean it seems to suggest that an even broader, more stringent, more rigorous exclusivity clause is part of the business of insurance. And here we're talking about something not as difficult for the agents. So one of the things that Thompson underscored – and again, I would urge the court not to consider itself bound by Thompson. And none of this court's subsequent decisions have suggested that it is. I mean in the Gilchrist case, Thompson wasn't even cited. And in Sanger, it was cited only for the proposition that there have been courts that have – let me get the right word. A number – in re-insurance brokerage aside, a number of courts of appeals have generally characterized challenge dealings as within the business of insurance. So have we. And that's just a cite to Thompson. The Fifth Circuit in Sanger did not purport to apply Thompson as supplying governing law. It applied the three Perino factors. So I also would say that what Thompson – if you look at page 444 of the Thompson decision, after saying that clearly not all provisions that could be placed in an agency contract nor all dealings are exempted… …the court then discussed the Eighth Circuit's decision in Zelson, which required an insurance company – the insurance company was required its agents to provide security services, securities services. And as a condition – and here's the relevant discussion, Judge Brasher. The court says at Westlaw Note 3, Appellee's restrictions did not force appellant to engage in activities unrelated to insurance. This was an optional contract that offered appellant various incentives. And I think that is a distinction in the type of provision that was at stake there and the type of provision here. But our case on Thompson doesn't principally rely on that distinction. All right. I see I'm way over time. I would love to keep talking, but I will defer to General Delrahim. Before you start, just so Mr. Chesler knows, I promised my colleagues on the panel that we would have a fulsome discussion in this case and that everybody would get to ask all the questions they wanted to. So I expect Mr. Chesler will go over on his time as well. But now we'll hear from – I'm waiting with bated breath to see how sporting the United States is feeling this morning. Well, thank you, Your Honors. May it please the court, Makan Delrahim, on behalf of the United States. I will just mention why I'm here, most importantly, and then I'll be delighted to feel as sporty as you would like me to be. We appear in private actions as amicus where the antitrust laws have been applied in an overbroad manner, and we appeared when immunities or exemptions have been applied in an overbroad manner. My interest on behalf of the United States is the full and, more importantly, proper application of the antitrust laws to protect competition. Here we appear, Your Honor, because we are concerned that the district court has misinterpreted the laws as to what conduct or transactions should be subject to the antitrust laws and the limits of the exemption. And I'm happy to take any questions, but I'd like to address both Thompson to supplement Mr. Waxman's comments in response to Judge Brasher's question. I think Thompson, which is a case that Florida Blues Council very wisely relies on heavily, but I think it's distinguishable. And the reason I think they rely on it is because it's almost the only authority since that case that would support their position. So in addition to what Mr. Waxman has said, what's important is that Thompson was a summary judgment motion. The case before us is a 12B6. There has been no development of the facts here, and we must apply the 12B6 standards to see whether or not the case survives. Counsel, this is Robert Buck. I want to tell you, and I appreciate Judge Martin's indulgence if this question is long and you go over as a result, so I apologize. But I just want to point out to you the provisions of Thompson or the language in Thompson that I'm concerned about in terms of it being binding on us. And I'll lay them all out, and then please just address my points. My issue is that continually we address the plural provisions of the contract throughout, not just the contract provision of other insurance, but provisions of the entire contract. Let me give you examples. On page 441, the conditions pertinent to this appeal are, and then lay out all three sections. Same page when discussing the Apley's motion, the one for the motion to dismiss. In response, Apley contended that the agency contract and its provisions were exempt from antitrust scrutiny by virtue of its constituting the business of insurance. Page 442, the principal issue, this is the issue, joined in this appeal is whether the challenged provisions of Appellant's NILAC agency contract are exempt, not is exempt, but are exempt, plural, as being contrary to the act. This is describing the trial court's order. The trial court concluded the terms and conditions of the agency contract were a fortiori within the business of insurance. I like the way Mr. Waxman said a fortiori much better than the way I said. And then in the conclusionary section on page 444, the Apley's restrictions did not force Appellant to engage in activities unrelated to insurance. Throughout, we continue to say the plural when discussing all three of the provisions there. And so I'm having trouble reading it as any way that doesn't incorporate the restrictive covenant portion of the contract. And I'm sorry that's such a long question, and I hope Judge Martin will indulge you the time to respond. Absolutely. Thank you, Judge Locke. So importantly, even assuming that they factor in this provision, as opposed to just the provision that precludes the insurer from engaging in the motel business that they were in, it is that Thompson did not apply. It adopted maybe, I think, a paragraph to the analysis of the business of insurance. And, of course, it was not guided by the later Pereno factors that the Supreme Court took. It did refer to royal drug, certainly, but the Supreme Court three years later took Pereno and refined the standard even further, following its own guidance to, you know, and the well-settled law that the Supreme Court has said to construe exemptions narrowly, as well as the Supreme Court said in St. Paul specifically with the provisions here that the exceptions to the exemptions be brought on qualified. So they did not apply the factors to this. They, you know, analyzed the provisions within one paragraph in Thompson. I would also suggest that, you know, if Thompson is viewed as limiting to the exact provision that they analyzed, United States versus Johnson in your court, the en banc decision last year would say you don't have to overrule Thompson in order to reach the conclusion that we're advocating for. You can limit it to just those facts. We believe that Thompson has been abrogated at a minimum by the Pereno test, and I think that's the proper test to be applied to these. Again, it's a 12B6 standard. We must assume that the facts alleged are accurate. Let's assume, let's assume that Thompson, we just don't have to follow Thompson or it doesn't exist. Why, under the Pereno factors, would it not still be the business of insurance, given that this is the method that the insurance company connects its insurance policy with the ultimate insured? So this is the route by which the insurance company gets to the insured, creates the insurance policy, and therefore spreads the risk. That's assuming. Judge Brasher, that is probably the most important question with respect to the business of insurance, and that is multiple cases have been trying to analyze. The first Pereno factor, I think, is the most important, and it is does it spread or transfer risk? And we saw that in Royal Drug as well as in multiple other lower court decisions, is in this contract, in this contract between the insured and the agent, is there any risk being transferred, the risk of the insured? In here, it was not. In St. Paul, it has been. In Hub, there has been, because the risk of liability from the insured has been now transferred. I'm sorry. This goes to that point. The first Pereno factor is not whether the risk has been transferred, but is the effect of the practice to transfer risk. So it isn't at the moment that the exclusive agreement is entered into, which is what you seem to be focusing on. The Supreme Court in Pereno seems to be focusing on the effect of that. And isn't the effect what Judge Brasher described of taking insureds who are not insured at all under the ACA and now making them insured, that is transferring and spreading risk? Your Honor, again, with respect to that issue, it is the insured is indifferent whether or not there's an exclusive provision or non-exclusive. In fact, I would argue that the insured would probably benefit if there's non-exclusivity and they actually have multiple choices from their agent. That is the issue, is that what is it important to the insured? In Royal Drug, it wasn't the pharmacy. They assured the risk of being reimbursed for the drug. They did not care what the insurance company paid or how they paid it, and the same thing in the chiropractor case. Here, the effect of the exclusivity provision of the agency relationship is completely – it does not affect the insured itself. And therefore, that's the test for whether or not there's a spreading or transfer of the risk of insurance. And this gets to the issue of the business of insurance. If we were to use that test, it seems like we would be limiting the business of insurance to literally the contract terms of the insurer. Is there anything – I mean, just as a hypothetical, is there anything you could point to that say, no, even under my test, the government's test, there's something outside of the specific insurance policy between the insured and the insured that would also be the business of insurance? Because it seems like that's what you're limiting. Well, absolutely, Your Honor. There is precedent where it is – the test is even if there is an agreement that is necessary for the proper administration of insurance. For example, in one of the cases, I believe it was in Royal Drug, it was discussed, they said if you need a line of credit, the insurance company needs a line of credit or other commercial paper, that is not in the business of insurance, even though it's necessary for them to function. And that was the test they applied because that line of insurance did not transfer the risk. They may need it in order to pay out claims, let's say, or for whatever reason. It might be necessary. It might be necessary for them to have an office. It'll certainly be necessary for them to have Zoom these days. But that is not the business of insurance as contemplated by Congress in passing the McCarran-Ferguson Act. So, I mean, is the business of insurance just limited to the insurance policy between the insurance company and the insurer? Is that – those are the only contract firms that we're worried about? And any other activities of an insurance company are just inherently not the business of insurance? I mean, is that what you're saying? No, Your Honor. Judge Brasher, there could be multiple types of arrangements rather than just what is between the insured and the insurer. The question is will those other arrangements affect the transfer of the risk? For example, reinsurance. So, you know, Florida Blue could be buying reinsurance from Swiss Re. And that is the business of insurance. However, because the reason for that is not because they're extending a line of credit. It's because they're transferring the risk that they have taken on from the insured and passed it on to reinsurance. And that is something that has been, you know, that was addressed in Hartford as well. All right. Thank you. Thank you, Judge Martin. Thank you, Your Honors. Mr. Chesler. Good morning, Your Honors. I'm Evan Chesler. I represent Florida Blue. May it please the Court. I hope the background – my neighbor has chosen to have his lawn cleaned today. I hope that doesn't get in the way. I apologize. I obviously want to address both issues that are up here on appeal, both the question of business of insurance and the question of coercion. I'm going to get to coercion as quickly as I can in light of Judge Brasher's comment that my friend, Mr. Waxman, was well advised to start there. I do want to start, and I will be brief on this issue, on the business of insurance. And before I get to the three Supreme Court factors, I want to just make a couple of basic points, if I may. First, selling insurance policies and the terms and conditions under which those policies are sold is the business of insurance. It is, frankly, hard to imagine if that is not the business of insurance, what is. That is how insurance companies make up their pool of insureds. That is how they determine the size of the pool. And quite importantly, that is how they match the risk profile of individual policyholders with the particular policy that they provide to that policyholder. All of those factors affect the premiums that are paid, and they affect the coverage that is provided. And those, in turn, are the evidence that we're talking about a practice, the effect of which is to transfer risk. Suppose there are two agencies on the same block competing with one another. One agency uses non-exclusive agents and agrees to give them a premium every time they sign up a low-risk policyholder. The agency down the street says, I'm going to do the same thing, but do it differently. I'm going to sign up exclusive agents. I'm going to educate them, invest in their training, make sure that when they do their job, they are balancing the risk of the insured and my risk, matching the right people to the right policies and growing my pool. The Supreme Court of the United States in the Royal Drug Case said the fundamental object of insurance, quote, is to distribute the loss over as wide an area as possible, unquote. Surely, if the bonuses to the low-risk insureds is the business of insurance, the competitor down the street who's accomplishing exactly the same thing in a different way by using exclusive agents is also the business of insurance. That's exactly the problem, though, counsel, that the exclusivity doesn't matter to the transfer. In other words, that's what I understand the government's argument to be, at least as articulated here, which is that I get how brokers affect it in general. There's no doubt about that in my mind. I'll only speak for myself. There's no doubt about that. But what does it matter if transfer of risk is signing up as many people who aren't insured to be insured, which I see it as, what does it matter if it's done through three agencies, 10 agencies, or 100 agencies, or through one agency? In other words, if the practice that we're focused on is exclusivity, how does exclusivity transfer and spread risk? Thank you for that question, Judge Locke, because it goes to the question of how you choose to incentivize your sales force. In fact, in the Thompson case, this court, the Fifth Circuit before the split in circuits found, that it was, in the court's words, dispositive that the insurance company was offering incentives there to the exclusive agents so that they would agree to focus all of their entrepreneurial skills solely on selling insurance. The exclusivity in Thompson was directly linked to the spreading of the risk. And in fact, in this case, Oscar explicitly pleads, for example, in paragraph seven of its complaint, that our exclusivity has given, quote, an overwhelming incentive to sell our plans. They're alleging exactly the same risk spreading factor element as the court found was dispositive in the Thompson case. But for spreading and for transferring, it doesn't really matter whether someone buys your plan or someone else's plan. It only matters that they buy a plan, right? Well, it matters, Your Honor, to the question of how risk is spread by my client if they, in fact, sell their policy as opposed to somebody else's policy. But doesn't that get us to the Third Circuit point, which is that if all we're talking about is just trading insurance, then all we're talking about is your bottom line, in other words, how much money you make at the end of the day. That's different from, as I understand it, spreading or transferring, which is making the pool so that the risk associated with the ultimate insurance industry is different. And that's why Sanger and the Ninth Circuit case are talking about the pool, the ultimate pool that's there for whether it spreads or transfers that risk. But, Your Honor, that leaves out the possibility that insurance policies are being sold that would not otherwise have been sold at all. And therefore, it's not just the total pool. It's the pools that are created by every insurance company to manage their risk that is relevant here. There's no question, as there was no question in Thompson, and there's no question based upon this complaint, that Florida Blue has chosen to spread risk for its business among a pool that is directly affected by the exclusivity practice. To the extent the pool would be smaller but for exclusivity, which is the gravamen of their entire case, that we're doing more business than we otherwise would, there's no basis in the complaint to say that every single person to whom we sell a policy would receive a policy from somebody else. I just have trouble understanding how that's different. That's not exactly what the Supreme Court has warned of. The business of the insurer, as your business, as opposed to the business of insurance, which is trying to get as many people covered who are not covered before and spreading out the risk of that so that there isn't too much risk one side or the other. Your Honor, I would submit that the cases, and it's not just Thompson. It's also the case in the Ninth Circuit, the Feinstein case. It's cases in other circuits around the country. They have not decided on that basis that use of exclusive agents is not the business of insurance. In fact, if you look at the defining principle that determines whether a case results in McCarran-Ferguson immunity or not, you'll find that it is the terms and conditions on which the insurance policies are sold that is the determining factor. For example, if you look at Thompson, it's the use of exclusive agents. If you look at Hartford Insurance, it's the forms on which they sold the insurance. Gilchrist is whether they were selling to cover OEM parts or not. Sanger was the use of exclusive broker. Feinstein was the use of exclusive agents. In the cases in which they're not dealing with the sale of insurance by whatever means the company chooses to use, you find, by and large, there is no immunity. National Securities involved a merger. Royal Drug involved reimbursement agreements by the pharmacies after the transaction took place. Parenno involved a peer review committee that had nothing to do with the sale of insurance. Let me ask you just a hypothetical. It's not really hypothetical. It's the real world. Is the contract between GEICO and the advertising agency that creates the GECCO, is that the business of insurance because that's the means through which GEICO increases the risk pool and sells its insurance? Well, Your Honor, again, thank you for the question. I'd just like to read from the Supreme Court's decision in the SEC against national securities case in 1969, and I'm quoting from page 460 of the U.S. Reporter. The selling and advertising of policies and the licensing of companies and their agents are also within the scope of the statute. That has to be dicta, though, because in Royal Drug, in that really terribly long footnote, I think it's footnote 32. I can't remember if it's Royal Drug or Parenno, but the Supreme Court specifically left open the issue of agents. So that language has to be dicta with relation to that, right? If you're questioning whether or not the agent itself is, under that circumstance, the advertising agent, I would agree, Your Honor. I was trying to be responsive to Judge Brash's question about the act. Your Honor correctly said before, the question is the effect of the practice. And if you look at it through that lens, which is what the Supreme Court said, the effect of that advertising is to spread the risk. I don't think there's any question about that. And I think dicta or not dicta, the language of the Supreme Court in national securities is very helpful with respect to that question. I would also add, we're not dealing with insurance here. We're dealing with the same practice that courts around the country, including in this circuit, have dealt with and have found to be the business of insurance, the use of exclusive agents. And I would say with all respect to my friend, Mr. Waxman, I find the arguments for how Thompson is no longer good law to be particularly unpersuasive. If I can ask about that, I'm sorry, because I do want to ask about Thompson before you get to coercion, which it sounded like you wanted to get to next. So I tend to agree with you that Perrino did not abrogate, at least as we understand that under our panel precedent rule, which is what you said last. But I do have an issue with the scope of what we said in Thompson. I mean, it is clear, and the court is clear in defining what's at issue, that the only thing that was challenged by the plaintiff, and you see that in the underlying documents that were attached as an appendix or exhibit to the brief, in addition, was the working outside the insurance industry clause. How do you hold on anything outside of that when that was the only thing at issue in the case? So I have two answers for your honor. One is the answer you gave before in your question to Mr. Delrahim, which is the entire opinion talks about all of the provisions of the agreement being the basis for the court's decision, not just one. And I would also go back to a point that Judge Brasher made before, which is, frankly, I think Thompson in this point helps my side, not the other side. They were finding the business of insurance in a provision that was much broader than Florida Bruce provision. They said, you opened up a motel and a restaurant, and that did not undermine McCarran-Ferguson, the exclusivity provision of the McCarran-Ferguson Act. Nobody here is suggesting that Oscar opened a restaurant or a motel. They're suggesting that they're selling the competitive product to ours, and we've said to our agents, you either sell our product or we don't do business with you. We have a much narrower exclusivity provision than was involved in Thompson, and yet the Thompson court found that it was the business of insurance. And so I would argue that, in fact, it cuts our way. I would also point out that not only, I can't imagine an argument that says that because Bill Criss didn't mention Thompson, somehow it abrogated it, abrogation by silence. And no one's given the memo to the Fifth Circuit because the Sanger court cited Thompson with authority only four or five years ago. So I think the argument just doesn't make it, notwithstanding the eloquence with which it's been articulated. So I think the business of insurance is what we're dealing with here, and the fact that my client has chosen to sell via exclusivity goes right to the heart of all of the factors. It's the relationship with the customers. Their complaint is just dripping with allegations about how critical this relationship is and how people rely upon our brokers. And they rely upon them so much that they say it's hurting them competitively. One of the reasons they rely upon our brokers is because of all the education invested in them through exclusivity. And also the parties to this agreement are my client, the agents, and the policyholders. They're all in the insurance industry with respect to the third factor. The argument that you must be uniquely involved in the insurance industry is wrong. None of the cases turn on that question. All of the cases that find exclusivity is immune involve situations that are not unique to the insurance industry. I mean, my goodness, OEM parts? Whoever said that OEM parts is unique to the insurance industry? And yet in the Gilchrist case, the court found that that issue was, quote, under the business of insurance. I want to turn then to coercion. The seminal case, the starting point for this question, as I think has been alluded to, is the Hartford Fire decision where Justice Scalia spoke for the court. And what Justice Scalia said, although he was dealing with a boycott, he was very careful in footnote six to make the point that, and these are his words, once it is determined that the actions of the reinsurers did not constitute a boycott, but rather a concerted agreement to terms, it follows that this action, that their actions do not constitute coercion or intimidation within the meaning of the statute. That's because, as previously mentioned, such concerted agreements do not coerce anyone, at least in the usual sense of the word, and because they are precisely what is protected by McCarran-Ferguson immunity. And what the court, in Justice Scalia's words, did in Hartford was to distinguish between two things. Do you have a boycott, which he equates in the footnote I just read to coercion, or do you have what he called concerted agreement to terms? And he actually defined what he meant by concerted agreement to terms. He said, I will deal with you, i.e., in our case, I will make you my exclusive agent, but only on my terms, i.e., exclusivity. Counsel, I don't want to stop you from making the argument you're making, but I can tell you, and I'm just speaking for myself, I'm not terribly convinced that the statute requires concerted action or more than one person here. I'm much more interested in whether this is coercion or coercive or not. Yes, and, Your Honor, don't take my use of the word concerted in that sentence to be talking about concerted action. I'm sorry, I thought that's the argument you were making, because that is an argument you make in your brief. It is, and if we had in the fullness of a lot of time, I would go to that argument, but in the interest of being parsimonious with everyone's time, I'm making the separate argument, which took up much of the argument before me, which is, what's the definition of coercion? Put aside concerted. It's just that Justice Scalia used the term concerted agreement to terms. I'm not using it as collective action. I'm just quoting what the court said there. As I say, he defined it very clearly. We'll deal with you, but only if you work with us on our terms. In our case, that's precisely what we're talking about. We will allow you to be our agent, but only if you would agree to our terms of exclusivity. Now, what the plaintiff and the government does here, mostly actually Oscar does here, is they try to retrade our deal. They try to rewrite our agreement and break it up into pieces and say, well, wait a minute. The fact that you can't sell elsewhere in the state somehow means you're coercing them. It's an unrelated transaction. The fact that we won't let you sell other lines of our insurance if you violate the exclusivity is other lines. The fact that you take back commissions is other lines. Those are not other transactions. They are, in fact, part of the transaction that has an issue here. In fact, in the St. Paul fire decision in 1978, the Supreme Court explained exactly what was meant by the unrelated transaction question. It says where they, quote, bore no relationship to the proposed contracts of insurance, they were unrelated terms. Now, I challenged Mr. Waxman to explain to this court how our exclusivity deal, which says if you sell somebody else's personal insurance line, you don't do business with me anymore, how that does not relate to the proposed contract of insurance. It's directly related. It's the terms on which they're working for us. I think his argument is a little broader than that, and certainly he can speak for himself way better than I ever could. But what I understood Mr. Waxman and their argument to be is that the evidence of coercion here, not just the contract itself, but the evidence of coercion is the threats and also those threats, which are that I don't like you, and so I'm targeting you in particular and not these other competitors who don't appear to be undercutting me and providing maybe a better product than I am. And if viewed in that way, and again, we view it in the light most favorable to the non-moving party here, I'm having trouble understanding how that fits in with what you're talking about. Here's, Your Honor, my answer to that. The words of what you say to enforce your agreement have never been held by any circuit to constitute coercion, where you were in fact attempting to enforce the very exclusivity issue, contract that issue. Indeed, in the Black case, which is a Third Circuit case, which affirmed a fairly lengthy district court opinion, they specifically talked about threats, pressures, and harassment techniques that were used. And yet they found that there was no coercion. What about selective enforcement? Selective enforcement, exactly the same issue, Your Honor. Their argument amounts to exclusivity is bad. Exclusivity should not be the business of insurance. But if you only enforce exclusivity sometimes, then it's coercion. The question is still, what is the practice involved? Not whether we've enforced it in every single instance and can they find some people against whom, according to the complaint at least, we didn't enforce it. What about the most troubling allegation in the complaint, from my perspective, is the one that says that the threat is not just we're not going to allow you to sell insurance at the same time for Blue and for Oscar at the same time, but that if you sell insurance for Oscar, you will never sell insurance for Blue again. What about that point? Again, Your Honor, with respect, that is enforcement of the terms of the agreement. There's no law that I'm aware of, and I think I've read every McCarran-Ferguson case. I mean, that just seems to me to be outside the terms of the agreement, because the terms of the agreement say you're an exclusive agent for Blue, you can't sell. And then if somebody says, OK, I don't want to do that, they go off and they sell for Oscar. The agreement doesn't seem to say whether they couldn't come back and sell for Blue again. That seems to be outside the terms of the agreement. Well, Your Honor, I would submit the words are not what's dispositive here. It's the question of whether having this exclusivity is or is not coercion in terms of enforcing the terms of the agreement. There's no case that turns on what's said in enforcing the agreement. The question is whether or not the agreement which is enforced is coercion or not. It doesn't turn on the words. Isn't this the tying issue, though? In other words, what you're saying, and this is just jumping off of Judge Brasher's question, which is that they're not just linking exclusivity regarding ACA and policies. Florida Blue is an enormous company. They provide all sorts of different policies. You can't sell any of our products down the line, which seems to be tying one thing to another. That isn't just words. That is an action and enforcement beyond that which is in the contract, right? No, Your Honor, because the terms of the agreement are you will either work for us as an exclusive agent or you will not work for us. There's only one license in Florida. You get licensed to sell insurance in the state. We hire you to be a licensed agent within the state of Florida. You happen to sit in one county because that's where people sit in their offices. But there's no separate license for one county versus another. We make a deal with the agent and say, now that you've been licensed, we will hire you, but only if you sell these policies exclusively for us. If you sell them for anybody else, you're out. To try to retrade that agreement and break it up and say, well, what about other counties in the state? That's not the deal we've made. And by the way, it's an option. People don't have to work for us. They can say, I don't want to be exclusive. I want to work for Oscar. I want to work for somebody else, so I'm not taking your deal. Once they agree to take that deal, the deal is very clear. It is an all or nothing contract. You either sell for me or you don't. So breaking up my deal into pieces, saying, well, what about other lines of insurance? What about other parts of the state? Is arguing about a deal we didn't make. What we're doing is enforcing the deal we did make, which is all or nothing. I know you're going to not like the standard that I'm going to give you, but I want your criticisms of this potentially being the standard for coercion. So what's wrong with this standard? The following. An insurance company coerces or uses coercion when it uses its market power to make another person act against their self-interest in their dealings with a third party. What is wrong with that definition of coercion? OK. There are. Respectfully, Your Honor, I do disagree with you. Of course you do. Yeah. Thank you. There are several things that are wrong with it. The first thing that's wrong with it are the cases that say that exercising monopoly power is not enough. And in virtually I've been trying antitrust cases for 40 years. I know a little bit about monopoly power, and it is almost always the case that the exercise of monopoly power fits the definition that Your Honor just recited. That would conflate the exercise of monopoly power and coercion under the McCarran-Ferguson Act together. And that's exactly what the cases have said you cannot do. I want to hear what else you're saying. But it seems like the cases that you're citing there, and I read those in the brief, I think by saying coercion, we're not necessarily saying that you violate the antitrust. Right. We're just saying that you don't fit within this exception. So it seems like that argument, although it might be persuasive, as well as your rule of reason arguments generally might be persuasive once you get to the substantive question of whether you violate the antitrust laws, aren't necessarily dispositive to whether you fit under this exception to the exception. I understand the distinction you're making or trying to make, Your Honor, but I would respond with this. However you word it, you're in fact collapsing the two. What you're saying is that as soon as you say you're using monopoly power to get someone to act against their interest, you are necessarily dealing with the merits of the antitrust laws. You can't find that a company has monopoly power unless you've determined the merits of the antitrust case. And the court cases are very clear and our district judge here was very clear. He said, and the cases say, I don't get to the merits of the antitrust case until I get over McCarran-Ferguson immunity. Otherwise, there's no point in dealing with immunity. It immunizes people who are accused of violating the antitrust laws. And so I would urge, Your Honor, to consider your standard and say, how do I deal with whether you've satisfied the standard by possessing monopoly power if I'm not already bleeding into the merits? I would also point out to Your Honor that you could easily apply that standard against self-interest to the Supreme Court's definition of the enforcement of the terms of an agreement. It may not, some agent may say, by the way, I would rather be able to sell a lot of different policies. To which our answer is, God bless you, go sell a lot of different policies for somebody else. But if you're going to work for us, you must abide by our terms. That's enforcement of the terms of the agreement. That's exactly what the Supreme Court said in Hartford is not coercion. And you can dress it up as plaintiffs tried to do with all sorts of words and they sent out emails that intimidated people. And they said, you can't sell anyplace else. The question I submit that this court must ask itself is put the hyperbole to the side and ask yourself, are we actually doing more than enforcing the terms of exclusivity as we agreed to exclusivity? Not as the plaintiff would redefine our exclusivity. So as only to apply in the county in which the agent sits or only to apply to a particular line of insurance. That's not our deal. Maybe somebody else wants to do that deal. That's not ours. And so long as that's not our deal, when we enforce our contract as it's written, and we are not in fact dealing with unrelated transactions, as the Supreme Court said in the insurance case I cited before, that have nothing to do with the insurance contract that issue, then we are entitled to McCarran-Ferguson immunity. And we are not carved out by the coercion exception. Can you name something, and this just as a hypothetical, can you tell me something that would be the business of insurance under your understanding of what the business of insurance would be, but would also be coercion under your understanding of coercion? So give me some example of how if we applied your definitions, there would be some meaning to those words. Well, for example, suppose we said to agents, and I'm doing this on the fly, so I apologize if this is less than crisp. Suppose we said to agents, if you don't comply with our exclusivity provision, that is you don't sell only our individual health plans, I won't reimburse your doctor when you take your annual physical. If that was what my client was doing, I might tell him, hire Mr. Waxman. He's a better lawyer than I am. I don't think I can defend that. So I'm just using that as a hypothetical to try to answer your hypothetical. And your point there is that they're so unrelated. That's your point, that those two things are unrelated. Exactly. They're unrelated. It's more than, quote, the exercise of monopoly power so that somebody's acting against his or her own self-interest. They meet your hypothetical, putting aside the monopoly power issue that I alluded to before. They fit within Justice Scalia's language in the Hartford insurance case. I think that's an example, you know, one perhaps of many. But that's not what we're doing. We're saying sell our policies or don't sell them and go to work for somebody else. That's an entirely different situation. And I would submit there's not a single case that they have cited, not one, that is authority for the proposition that that practice in which we are engaged is coercion under that section of the McCarran-Ferguson Act. Thank you, Mr. Chesler. Thank you, Your Honor. I guess we'll return to Mr. Waxman. You're muted, Mr. Waxman. Thank you. I have a number of points to make in response to my friend, Mr. Chesler, who, notwithstanding his modesty, is in fact the better lawyer between us. But four points on the business of insurance and one point, which is to respond to Mr. Chesler's challenge that I reconcile our position with Hartford Fire. Judge Brasher, you asked the question about, I think, of Mr. Delrahim, you know, is there something other than, in our view, that is the business of insurance other than the contract itself, which is, the Supreme Court has said, what transfers and spreads the policyholders risk? And the answer from the Supreme Court's case laws is, yes, it's the whole process of underwriting the risk. That is the classic business of insurance. And by underwriting, what we mean here is the insurer evaluates the probability that the insured risks will occur and their likely costs, if they do, and then prices the policy accordingly. Similarly, Judge Brasher claims adjustment performance of an insurance contract is the heartland of the business of insurance. Second of all, Mr. Chesler keeps talking about the importance and centrality of the role of brokers in selling insurance. Let's just be very clear about what we're challenging here. We are not challenging the selling of insurance. We are not challenging the selling of insurance through brokers. We are not challenging the roles that brokers play in educating potential policyholders and selling policies. This case is about, on the business of insurance side, the side agreement of an exclusive dealing relationship and whether that does or does not fall within the narrow confines of the business of insurance. Mr. Chesler also made the point repeatedly about how this is obviously spreading because we are spreading our risk every time we write more policies. The Supreme Court could not have been clearer, and I'll point just for an example to footnotes 9 and 12 in the Royal Drug case. The relevant test, and it is does the practice, and this is the Moreno test factor one, whether the practice has the effect of transferring or spreading a policyholder's risk. The notion of increasing the number of policies that an insurance company can write in order to reduce its risk is not the business of insurance. In Royal Drug, the Supreme Court emphasized, quote, the important distinction between risk underwriting and risk reduction. Risk underwriting is the business of insurance. It is what was at stake in Sanger and in the Ninth Circuit's decision in Feinstein because the challenge practice there, and I think Judge Luck was adverting to this, defined the insured group's risk profile and thus the scope of the risk transferred by the group policy. Risk reduction, on the other hand, refers to the insurer's efforts to reduce its own risk by getting more customers or lowering the cost of its inputs. That is not the business of insurance, and it is what was at issue in the Third Circuit's decision in insurance brokerage, and it is what is at issue here because insurance brokerage, like here, involved a market allocation agreement. The Third Circuit explained that that was not the business of insurance because it had no effect on the type of coverage offered or the risk profile of the insurance entities. The very same thing is true here, and that sentence from the Third Circuit's decision that I quoted was noted on page 744 of Sanger as the reason why Sanger was different for the reasons that I just articulated. The last thing I will say on the business of insurance relates to Thompson, and I think this goes to your – I think, Judge Luck, it was your point that it refers over and over again to the provisions challenged and whether or not that constitutes, therefore, a binding holding in this court. The only provision that was challenged in the complaint, the only provision that was actually adjudicated was the provision dealing with the fact that you can't operate a motel and a restaurant. The court's opinion certainly uses the plural over and over and over again, but as this court has explained repeatedly, and I'm thinking in particular of your decision last year in United States v. Johnson, I'm quoting, a decision's binding authority is limited to the facts of the case then before the court and the questions presented to the court in light of those facts. And so insofar as there is a broader reading of Thompson, that is dicta, in any event, I just don't think there can be any question that this court is bound to do what Thompson couldn't have done because Perrano and Hartford Fire hadn't been decided, which is in analyzing whether or not this side agreement between brokers and insurers falls within the heartland of the business insurance. It has to apply the three-factor test. Now, finally, as to my friend's challenge to square our view with Hartford Fire, I should say at the outset, in my opening argument, I was talking about the XYZ paradigm and I referred the court to pages 803 and 808 of Royal Drug. In fact, it's pages 803 and 808 of Royal Drug. In those pages, Hartford Fire is citing two cases of the form X refuses to deal with Y unless Y refuses to deal with Z. And that's exactly what we have here. The, quote, unrelated transaction that is the subject of the leverage is the broker's relationship with Oscar. It's not coercing brokers to agree to an exclusivity provision. It's coercing brokers to cut ties with Oscar, just as Hartford Fire contemplates. And I thank the court for its indulgence. Thank you. We appreciate the presentation from all counsel. Very, very helpful.